UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DARRYL D. ROBINSON,          )      CASE NO. 1:18CV1970
                             )
     Plaintiff,             )
                             )      JUDGE DONALD C. NUGENT
        v.                )      Magistrate Judge George J. Limbert
                             )
ANDREW M. SAUL[1],          )
COMMISSIONER OF SOCIAL    )      REPORT AND RECOMMENDATION
SECURITY ADMINISTRATION,    )      OF MAGISTRATE JUDGE
                             )
     Defendant.          )

Plaintiff Darryl D. Robinson ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1. In his brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ")'s refusals to allow his counsel to submit a written interrogatory to the vocational expert ("VE") and to continue her cross-examination of the vocational expert ("VE") at the ALJ hearing resulted in a decision that was not supported by substantial evidence.  ECF Dkt. #14.  For the following reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.

**I.**     **FACTUAL AND PROCEDURAL HISTORY**

     **A.**     **APPLICATION HISTORY**

Plaintiff protectively filed applications for DIB and SSI on January 14, 2013 alleging disability beginning August 14, 1982 due to a disabled right hand and limited use of his right arm. ECF Dkt. #11 ("Tr.") at 144, 468-480, 529.[2]  The Social Security Administration ("SSA") denied his applications initially and upon reconsideration.  *Id.* at 238-249.

---

[1]On June 17, 2019, Andrew M. Saul became the Commissioner of the Social Security Administration ("SSA"), replacing Nancy A. Berryhill, who was the acting Commissioner of Social Security.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled.  This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

Plaintiff requested a hearing before an ALJ, which was scheduled for February 5, 2015.  Tr. at 250, 255.  The ALJ held a hearing on that date, where Plaintiff was represented by counsel and testified.  *Id*. at 31, 81, 250.  A vocational expert ("VE") also testified.  *Id.* at 31.

## B.    FIRST ALJ DECISION AND APPEALS COUNCIL REMAND ORDER

On April 17, 2015, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI.  Tr. at 215-225.  Plaintiff requested that the Appeals Council review the ALJ's decision and on July 1, 2016, the Appeals Council granted his request for review, vacated the ALJ's decision, and remanded Plaintiff's case in order for the ALJ to resolve the following issues:

> The manipulative limitations set forth in the Administrative Law Judge's residual functional capacity assessment are internally inconsistent. The Administrative Law Judge found the claimant could never reach, handle, feel, or finger with the right upper extremity, but that he could use his right arm to assist his left arm (Finding 5). Social Security Ruling 85-15 defines reaching as "extending the hands and arms in any direction." As such, a limitation to never reaching would, by definition, preclude the use of the right arm to assist the left. Moreover, despite finding the claimant could never reach, handle, feel, or finger with the right upper extremity, the Administrative Law Judge found that the claimant could perform the jobs of housekeeping cleaner (DOT 323.687-014), clerical assistant (239.567-010), and garment folder (DOT 789.687-066) (Findings 5 and 10).

> The Dictionary of Occupational Titles (DOT) describes the job of housekeeping cleaner as requiring frequent reaching and handling and occasional fingering. It describes the job of clerical assistant as requiring frequent reaching, handling, and fingering. It describes the job of garment folder as requiring constant reaching, handling, and fingering. As such, these jobs are precluded by the restriction in the residual functional capacity assessment to never reaching, handling, or fingering. An audit of the hearing recording reflects that the Administrative Law Judge did not elicit vocational expert testimony to resolve any conflicts between his testimony and the DOT or clarify the basis for any inconsistencies.

> Moreover, in finding the claimant could perform these jobs, the Administrative Law Judge appears to have relied upon vocational expert testimony that was outside the area of the vocational expert's expertise, responsibility, and authority. Pursuant to HALLEX I-2-6-74C, an Administrative Law Judge must not permit a vocational expert to respond to questions on medical matters or to draw conclusions that are not within his or her area of expertise; a vocational expert may not provide opinions concerning a claimant's residual functional capacity or the resolution of ultimate issues of fact or law.

> An audit of the hearing recording reflects that the vocational expert's testimony was not in response to the limitations set forth in the Administrative Law Judge's hypothetical question. Moreover, the Administrative Law Judge permitted the vocational expert to interpret the defined limitations as including the ability to assist the left arm with the right arm, which was adopted in the residual functional capacity assessment set forth in the hearing decision (Finding 5). Further consideration of the claimant's manipulative limitations

-2-

and restrictions and the impact this would have on his ability to perform jobs at step five of the sequential evaluation process is warranted.

Upon remand the Administrative Law Judge will:

Further, obtain evidence from a medical expert, if available, to clarify the nature, severity, and limiting effects, of the claimant's right upper extremity impairment (20 CFR 404.1527(e) and 416.927(e) and Social Security Ruling 96-6p).

Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate opinion evidence in the record pursuant to the provisions of 20 CFR 404.1527 and 416.927 and Social Security Rulings 96-2p, 96-5p and 96-6p, and explain the weight given to such opinions. As appropriate, the Administrative Law Judge may request the treating and nontreating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments (20 CFR 404.1512 and 416.912). The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating sources.

Finally, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83- 14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

Tr. at 232-233.

## C.    TESTIMONIAL EVIDENCE

On October 27, 2016, the ALJ held a hearing on the remand issued by the Appeals Council, with Plaintiff's attorney, a medical expert ("ME") and the VE appearing.  Tr. at 73. The ALJ noted for the record the presence of these individuals, and the non-appearance of Plaintiff.  *Id*. at 74.  The ALJ indicated that he was going to issue a formal notice to show cause to Plaintiff, but he was going to postpone the hearing based upon information he received from Plaintiff's counsel and he would reschedule the hearing.  *Id.* at 74-75.

On March 21, 2017, the ALJ held a hearing, with Plaintiff's counsel, a ME and a VE present.  Tr. at 76.  The ALJ indicated on the record that Plaintiff was not present at the hearing and Plaintiff's counsel explained that counsel and Plaintiff both thought that the hearing was at another location and while counsel was able to make it to the instant hearing, Plaintiff was unable to obtain transportation in sufficient time to make the hearing.  *Id*. at 78.  With no objection by Plaintiff's counsel and stipulation to the VE's qualifications, the ALJ proceeded with the hearing as to the VE's testimony.  *Id*. at 79.  The ALJ presented a hypothetical individual to the VE who was a younger person, with:  no past relevant work; limitations to the light exertional level; no climbing of ladders, ropes or scaffolds; occasional crawling; constant handling, fingering, feeling, or reaching with one hand; with the other hand could frequently reach, handle, and feel, but could only occasionally finger; had to avoid all exposure to hazards such as operating dangerous machines; limitations to understanding and remembering simple, one to three-step instructions; limitations to sustaining concentration to perform such tasks in a setting where there are no fast-paced demands; limitations to superficial interactions with others, meaning that person cannot arbitrate, negotiate, or resolve conflicts, or supervise or manage others, or be responsible for the health, safety, or welfare of others; limitations to work in a non-public setting where he is not required to persuade others or resolve conflicts; and limitations to adapting to only infrequent changes in a static work setting.  *Id*. at 82-83.  The VE responded that such a hypothetical individual could perform jobs existing in significant numbers in the national economy, such as merchandise marker, housekeeping cleaner, and mail clerk role outside of the post office.  *Id.* at 83-85.

Plaintiff's counsel questioned the VE, asking if the same jobs would be available to the hypothetical individual if he had no functional use of the arm and had a limitation to never reaching, would preclude the use of the right arm to assist the left arm.  Tr. at 85-86.  The VE responded that no jobs would be available for such a person.  *Id*. at 86.

-4-

After further questioning and discussion, the ALJ indicated that he would review the evidence and determine the best course of action, and he would issue a notice to show cause to Plaintiff since he did not appear for the hearing.  *Id.* at 86-92.

On October 12, 2017, the ALJ held another hearing, with Plaintiff's counsel, the ME, and the VE present.  Tr. at 94.  The ALJ noted Plaintiff's absence and his prior absences as well, and he stated that the Appeals Council wanted him to obtain a better understanding of Plaintiff's limitations, but a lack of medical evidence was problematic, and a consultative examination opinion conflicted with some of the evidence.  *Id.* at 96.  The ALJ further noted Plaintiff's failure to cooperate not only by his failures to appear at the scheduled hearings, but his failure to appear for two scheduled consultative examinations that were scheduled following the Appeals Council remand.  *Id.* at 96.  When the ALJ asked Plaintiff's counsel about the last time she had heard from Plaintiff, she responded that her firm received some returned letters indicating that it had a bad address for Plaintiff, but the ALJ indicated that the SSA did not receive any returned mail on its notices of hearing sent to Plaintiff.  *Id.* at 97-98.  The ALJ indicated that it looked like Plaintiff was abandoning his appeal and the ALJ wondered aloud why he should not just issue an unfavorable decision based upon Plaintiff's failure to cooperate, his failures to show good cause for his absences at the hearings, his failures to attend consultative examinations, and the ALJ's resulting inability to resolve a serious conflict in the evidence as to how limited Plaintiff is with his right hand.  *Id.* at 98.  The ALJ also indicated on the record that he had a ME present at one of the hearings in order to discuss Plaintiff's right hand and arm impairment, but Plaintiff did not appear at that hearing and the ME indicated that he did not receive any materials and could not proceed with a hearing.  *Id.* at 100.  The ALJ further noted that a consultative examiner indicated that Plaintiff did not have the functional use of his right upper extremity, yet he was seen using his hands, he could pull up his socks, and he worked for a month at McDonald's.  *Id.* at 102-103.

The ALJ then proceeded with the hearing, with the ME testifying first.  Tr. at 105.  The ME opined that due to Plaintiff's congenital problem with his right hand and upper right extremity due to his chronic and severe contractures of his right hand, he would certainly be limited in any use of his right upper extremity.  *Id.* at 107.  The ME also noted Plaintiff's complaints to his medical providers of pain which sometimes reached 10 out of 10 and Plaintiff's visit to a pain clinic in 2013.  *Id.*  The ME cited to the consultative examination performed by Dr. Sioson in which Dr. Sioson noted Plaintiff's main deformities of his second and third right fingers, with the third finger the inflexion contractor or all joints and on top of it was deviated.  *Id.* at 108.  The ME further noted Dr. Sioson's findings that Plaintiff's second finger could not be separated from the third, and the right thumb, fourth and fifth finger appeared normal but were weaker.  *Id.*  The ME also indicated that the examination showed that Plaintiff could pinch the edge of his sock using his right thumb against part of the second finger to help his left hand put it on.  *Id.*  The ME also cited to notes from a pain clinic where Plaintiff was complaining of right arm pain for over 17 years which Plaintiff rated as a 10 out of 10 all of the time, for which he took no medications, but described the pain as sharp and throbbing, which affected his physical activity, appetite, and ability to sleep.  *Id.* The pain clinic note indicated that Plaintiff was trying to get on disability.  *Id.*

When the ALJ asked the ME whether Plaintiff's conditions met or equaled any of the Listing of Impairments, the ME responded that they did not.  Tr. at 109.  When the ALJ asked the ME to opine limitations for Plaintiff, the ME responded, "Well, I mean, they're very clear, Judge.  And, you know, this is really an issue I'd be glad to give you my opinion but this a vocational opinion that we have descriptions of what he can do.  His upper arm, his biceps, his forearm, they probably have use, but he can't do much with his hand."  *Id.* at 110.  The ME further opined:

> And he doesn't come under surgical problems with [Listing] 1.06 or 1.08 but he just has a congenital deformity which would limit what he can do with his right

-6-

hand particularly which isn't very much at all, and somewhat limited in terms of what he can do with the rest of his arm.  And I mean that's all I can say about it.

Now, what the defaults to in terms of what he can be able to do, he's essentially a one-armed individual to a large degree.  But he does have some use of the upper arm.  He can use, as they described in one exam, he can use it to support his left hand to help him do things, I assume to get dressed, et cetera., but I can't really answer that question.  He's limited in that respect and I think it's a vocational question as to what kind of jobs might be available.

*Id.* at 110-111.  When the ALJ asked the ME about Plaintiff's abilities to finger, handle, reach, or feel with his right hand, the ME opined that, "[f]ingering, handling, fine and gross manipulation with his right hand is extremely limited.  It's less than occasional to not be at all useful, certainly in a workplace.  In terms of reaching - - * * *, nothing prevents him from reaching."  *Id.* at 112.  The ME elaborated on his opined limitations:

A:  All right.  It's extremely limited, so in terms of fingering.  Anything to do with his hand he's got contractures.  He can't open two fingers, so he can't do very much with his right hand in terms of manipulations, fine and gross manipulations.  Gripping, it is extremely limited as described.  He can use his right hand to assist his left hand.  In terms of reaching, nothing prevents him from reaching in all directions, reaching overhead, et cetera, because there's nothing wrong with his ability to reach.  It's just his hand that is - - and the strength of his right arm is weak because it's atrophied.

Q:  Okay.  So, we've got - -

A:  So, he essentially cannot do much.  He can do what's been described very nicely in that one consultative exam.  He can use his right hand and arm to assist his left.  And that's a pretty apt description I think for vocational assessment as to what he may or may not be able to do in the workplace.  And fingering, and grasping, and fine, gross manipulation, extremely limited.

Q:  Okay.  What would you say as far as feeling with that hand?

A:  I don't know because there aren't descriptions.  There's no nerve conduction.  The sensory exam was not done.  I don't think it's terribly important because he - - whether he has feeling in it or not, he's not going to be able to do any more or less with it.  So I can't say because I don't have enough objective evidence to answer that question.

*         *         *

A.  Right, but the limitations are extremely limited in terms of handling, fingering, and feeling, okay?

-7-

*     *     *

A:       Well, it's hard to know how much he can lift and/or carry.  But I would say that because he has one good arm and one arm that's weak, I'm going to say that I would not expect anything greater in terms of lift and/or carry greater than 20 pounds.  So 20 pounds occasionally and 10 pounds or less frequently for lift and/or carry.

Sitting and standing should have no limitations.  Lower extremity, use of foot controls and so on would have no limitations.  If the upper extremity, we've already dealt with in terms of very limited, extremely limited fine and gross manipulation and grasping with his right hand, there's no limitation on reaching overhead or reaching in all directions.

But if he were required to perform something right-handed, he probably couldn't do it depending on the weight limits.  I would have to reduce any weight limits on his right arm to certainly the sedentary level of ten pounds occasionally if he ever was involved in pushing and pulling with his right upper extremity because his hand is contracted and it's documented that his whole arm is atrophied even though he has normal biceps function.  But I would have to limit him to say ten pounds occasionally and less than ten pounds frequently if something were required involving weights on the right arm.

And of course, would be no ropes, and no ladders, no unprotected heights, and there would be no limitation on stairs or ramps or crawling, kneeling, bending, stooping, crouching, extending.  And environmental, I can't see reason why there would be environmental limitations.

*     *     *

Of course, there should be no requirement for driving.  I don't know if he drives or not, but certainly not for driving on the job.

*Id*. at 112-117.

After Plaintiff's attorney questioned the ME, the ALJ thereafter proceeded to question the VE.  Tr. at 122.  The ALJ asked the VE to assume a hypothetical individual with the claimant's same age, education and work background with no past relevant work, and with: the abilities to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently when using both upper extremities, but only up to 10 pounds occasionally and less than that frequently when lifting and carrying with the non-dominant right arm; sitting, standing and walking for up to 6 hours per day of an 8-hour workday; no climbing of ladders, ropes or scaffolds; occasional crawling; avoiding all exposure to hazards such as machinery and

-8-

unprotected heights; no commercial driving; dominant upper extremity can constantly handle, finger, feel and reach, but non-dominant right upper extremity is limited to less than occasional handling, fingering, or feeling, but no limitation on reaching with non-dominant upper extremity;  understanding and remembering simple one to three-step instructions commensurate with a SVP of 1 or 2 skill level; ability to concentrate and persist on simple one to three-step tasks commensurate with 1 and 2 SVP skill level in a work setting that does not have a fast pace; superficial interaction with others, in that his job duties cannot involve arbitration, negotiation, or conflict resolution, supervision or management of others or being responsible for the health, safety or welfare of others; and capable of adapting to infrequent changes in a static, non-public work setting. *Id.* at 127-128.

The VE responded by first stating that most of the literature and studies relating to dexterity, handling and fingering deal with bilateral dexterity in most jobs because the hands need to work together.  Tr. at 128.  He indicated that in his experience, someone with the limitations that the ALJ set forth in the hypothetical individual would probably need special accommodation due to the very low bimanual dexterity for manipulation.  *Id*. at 129.  He identified the jobs of surveillance system monitor, restaurant host, and school bus monitor, but he noted that the number of these jobs would be very limited because sedentary jobs are for the most part high-dexterity positions and the non-public setting and superficial interaction limitations would also cause problems.  *Id*. He opined that the hypothetical individual could not be employed without a specialized placement or accommodation.  *Id.*  The ALJ identified additional jobs, but the VE indicated that those jobs could not be performed without some use of non-dominant hand and bimanual dexterity.  *Id.*

The ALJ inquired further into the surveillance system monitor job, and the VE explained that it would meet the hypothetical individual limitations, although the person would need to use a computer for computer entry using one hand, so in some settings, the job could not be performed, and thus there would be very reduced numbers of these jobs available.  Tr. at

-9-

130.  He estimated that about 15,000 such jobs would be available out of 100,000 existing in the national economy.  *Id.*

Plaintiff's counsel then questioned the VE.  Tr. at 131.  She questioned the VE's testimony concerning the skill set required with the surveillance system monitor position, explaining that in her experience with this position, it has been discredited because most of the jobs are done by the government with transportation agencies and after 9/11, a higher skill-set is required.   *Id*. The VE responded that he agreed that this job is more classified in transportation systems, but his experience and observation is that there are some positions available in retail settings and office complexes that have monitoring through videos and that do not require the higher skill-set and in fact are unskilled positions.  *Id.* at 131-132.  Plaintiff's counsel also questioned the VE's number of 15,000 such jobs available and he responded that it was his estimation based upon his experience.  *Id*. at 135.

When the ALJ asked to clarify whether the 15,000 jobs needed a special accommodation, the VE answered that he did not believe so, but he thought in general that it would be best to have someone help with a specialized placement for the hypothetical individual.  Tr. at 136.  He indicated that, "I think the person could do the job, whether they would be placed or not I guess is something I don't consider."  *Id*.  Plaintiff's counsel proceeded to question the VE further, which is set forth in more detail in the Law and Analysis Section below.

On November 2, 2017, Plaintiff responded to the most recent show cause notice issued to him by the ALJ and he filed a letter explaining why he missed the October 12, 2017 hearing.  Tr. at 30.  He explained that he did not receive the June 27, 2017 notice of hearing because he has not resided at the address where it was sent for nearly a year and he was currently homeless.  *Id.*  He further explained that he also did not receive notices regarding consultative examinations because he was homeless.  *Id*.  He further indicated that he could not contact his counsel to check into the status of his case because he could not regularly afford a phone.  *Id.*

-10-

He explained that he received a Facebook message from his attorney's office on October 20, 2017 and that is when he found out about the missed hearings and exams.  *Id.*  He indicated that he wanted to pursue his claims.  *Id.* He apologized and asked the ALJ to reschedule the hearing in the Ashtabula Office rather than again in Cleveland, so that could attend because of his financial strain and lack of transportation.  *Id.*

### D.     INSTANT ALJ DECISION

On January 11, 2018, the ALJ issued a decision.  The ALJ first found that Plaintiff had engaged "in work activity" from July to September 2015 and he noted that Plaintiff earned "3151.00 at RK Hotels and Investments in Conneaut, Ohio, in the third quarter of 2015." Tr. at 13.  The ALJ indicated that over the three months, the amount to show substantial gainful activity was $3,270.00.  *Id.*  He found that those earnings were close to the substantial gainful activity level and Plaintiff failed to show at the hearing and did not explain this work activity.  *Id.* at 13-14.

The ALJ further found that Plaintiff had the following severe impairments: right arm birth defect; borderline intellectual functioning; polysubtance abuse; depressive disorder; anxiety disorder; and borderline personality disorder with antisocial features.  Tr. at 14.  He determined that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1.  *Id.* at 14-15.  After considering the record, the ALJ found that Plaintiff had the RFC to perform light work with the following limitations: lifting, carrying, pushing or pulling 20 pounds occasionally and less than that frequently when using the right non-dominant upper extremity; sitting, standing, or walking for 6 hours each in an 8-hour day; no climbing of ladders, ropes or scaffolds; no exposure to hazards such as unprotected heights or dangerous machinery; no commercial driving; occasionally crawling; left hand dominance with the ability to constantly handle, finger, feel or reach with dominant upper extremity; non-dominant right upper extremity limited to less than occasional handling, fingering, or feeling, but no limitation

-11-

on reaching; understanding and remembering simple 1-3 step instructions commensurate with the SVP 1 or 2 skill level; sustained concentration and persistence on simple 1-3 step tasks commensurate with the SVP 1 or 2 skill level in a setting that does not require a fast pace; superficial interactions, meaning jobs duties that do not require Plaintiff to arbitrate, negotiate, or resolve conflict, no supervision or management of others, and no responsibility for the health, welfare or safety of others; the ability to adapt to infrequent changes in a static, non-public work setting.  *Id.* at 15-20.

Based upon Plaintiff's age, education, work experience, the RFC, the VE's testimony, and Plaintiff's "lack of cooperation throughout the hearing process," the ALJ determined that Plaintiff had no past relevant work, but he could perform jobs existing in significant numbers in the national economy, such as a surveillance system monitor, which is defined as light, unskilled SVP2.  Tr. at *21*.  In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, and he was not entitled to DIB or SSI from August 14, 1982 through the date of his decision.  *Id.*

### E.      FILINGS IN THIS COURT

On August 27, 2018, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1.  He filed a merits brief on January 31, 2019 and Defendant filed a merits brief on April 17, 2019.  ECF Dkt. #s 14, 17.  Plaintiff filed a reply brief on April 25, 2019.  ECF Dkt. #18.

## II.      RELEVANT MEDICAL EVIDENCE

### A.      PHYSICAL IMPAIRMENTS

The only relevant medical records show that on February 8, 2013, Plaintiff presented to the Ashtabula County Medical Center emergency department complaining of pain from his right hand up to his shoulder.  Tr. at 633.  He indicated that he was born with a birth defect and it occasionally hurt him.  *Id*. Physical examination showed that Plaintiff's right arm was smaller than his left and his fingers were contracted in flexion.  *Id*. at 635.  The doctor noted Plaintiff's deformity and probable nerve damage to his right arm from birth and advised him

-12-

that if he suffered from chronic pain, he should be followed by a pain management specialist and would be referred.  *Id*.  Plaintiff was given Naprosyn and Ultram.  *Id*.

Plaintiff presented to the emergency room on March 6, 2013 complaining of right hand and arm pain that had its onset a week prior.  Tr. at 650.  The Comments section indicated that Plaintiff had a "Congenital defect LUE including hand c/o ongoing pain and is scheduled for pain management evaluation 3/19 denies trauma."  *Id*.  A review of the systems section indicated that Plaintiff had "[l]eft arm pain and congenital deformity."  *Id.* at 651.  Upon examination, the doctor indicated that Plaintiff had an "[u]nder developed LUE with hand and finger deformity."  *Id*.  Plaintiff was diagnosed with arm pain.  *Id.* at 651.

Plaintiff presented to the pain management center on March 19, 2013 for a consultation with Dr. Hill.  Tr. at 643.  He complained of right arm pain for over 17 years due to a birth defect in his right hand.  *Id*.  He stated that he had chronic right arm pain since he could remember and he rated it as a 10 out of 10 all of the time.  *Id*.  He described the pain as a sharp throb and ache that affected his physical activity, appetite and sleep.  *Id*.  Dr. Hill noted that Plaintiff was trying to get on disability, he took no medication for the pain and had not had physical therapy, and he had no x-rays or diagnostic studies of recent history.  *Id.*  Physical examination revealed an obvious deformity of Plaintiff's right hand with the inability to make a fist*.  Id.* at 644.  Dr. Hill ordered an EMG nerve conduction study of Plaintiff's right upper extremity and x-rays of the cervical spine.  *Id*.  He was prescribed Neurontin and Dr. Hill noted that a referral to an orthopedic surgeon may be necessary to see if any surgical procedures could improve Plaintiff's right hand function.  *Id.*  The cervical x-ray showed loss of normal lordosis, narrowing of the neural foramina on the right at C3-C4 and C4-C5.  *Id.* at 645.

On June 5, 2013, Dr. Sioson examined Plaintiff at the request of the agency.  Tr. at 673. He noted Plaintiff's deformed right hand with no corrective surgery when he was younger.  *Id*. Plaintiff reported that he did not use his right hand at all, he had pain that went up his shoulder, and he rated the pain a 10/10 with over-the-counter pain pills bringing down the pain to a 5/10. *Id.*  Plaintiff indicated that he could dress and groom himself, shower, and button his clothing, but he needed help if tasks required the use of two hands.  *Id.*  Plaintiff also related his history

of depression since he was 21 years old, with no suicidal thoughts, and sharp chest pains twice a month due to stress.  *Id.*  He described poor sleep, fair appetite, and lost weight, feeling tired most of the time, and no memory or concentration problems.  *Id*.  Plaintiff also reported that he was homeless and stays with friends.  *Id*.

Upon physical examination, Dr. Sioson noted pain on range of motion in the right shoulder, the main deformity in Plaintiff's second and third fingers of his right hand, with the third finger in flexion contracture of all joints and on top was an inwardly deviated 2nd finger and they could not be separated.  Tr. at 674.  He further noted that Plaintiff's right thumb, and fourth and fifth fingers appeared normal but were weaker, although Plaintiff could pinch the edge of his sock using his right thumb against part of his second finger to help his left hand put on the sock.  *Id*.  He was also able to grasp and hold the dynamometer and manipulate with his left hand.  *Id.*

Dr. Sioson's impressions were that Plaintiff had a right upper extremity problem as he had a right hand deformity with contracted 2nd and 3rd fingers and smaller muscle bulk of the whole right upper extremity; and a mental disorder as Plaintiff was not emotionally labile, but was able to maintain attention and concentration.  Tr. at 574.  He opined that Plaintiff essentially had a non-functional right upper extremity for work-related activities, but he would have no problem using his other extremities.  *Id*.

On November 8, 2014, Plaintiff presented to the emergency room complaining of pain in his right upper extremity.  Tr. at 745.  He was treated and discharged.  *Id.* at 746.

On January 31, 2015, Plaintiff presented to the emergency room for right arm pain.  Tr. at 748.  Plaintiff explained that the pain would come and go, but he had only mild relief the past two weeks with Tylenol.  *Id*. at 749.  Physical examination showed a normal right forearm, with no tenderness, swelling, edema or laceration.  *Id*. at 750.  He was diagnosed with arm pain and referred for pain management.  *Id.*

## B.      MENTAL IMPAIRMENTS

On March 13, 2013, Plaintiff presented to Lake Area Recovery Center for an assessment as part of his probation after he reportedly found his child's mother with another

-14-

man in September of 2012 and he broke a window and ran off and hid. Tr. at 706. Plaintiff reported that he was caught in November of 2012 on an outstanding warrant on this incident and for operating a motor vehicle without a license. *Id.* He indicated that he was charged with misdemeanor domestic violence and sentenced to 23 days in jail and 6 months of probation. *Id.* Plaintiff indicated that alcohol and marijuana were problems for him, he had no chronic medical problems that continued to interfere with his life, but he had pain in his right arm and was currently waiting for a SSI determination. *Id.* at 710. He also indicated that he had completed the 11th grade in school and was going to school for his GED, and he was a poor student, and he was in regular classes. *Id.* at 712. He also indicated that he was arrested and charged with 9 probation/parole violations in the past, and 1 drug charge, 2 weapons offenses, 4 assaults, 1 domestic violence, and 15 major driving violations. *Id.* The assessor indicated that Plaintiff appeared disheveled, he was cooperative and calm, his affect was flat, his mood was euthymic, his speech was normal, and his thought process was intact. *Id.* at 714. Plaintiff had no hallucinations, delusions, or thoughts of homicide of suicide, he was oriented, had intact remote and recent memory, and was of average intellect. *Id.* at 715. Plaintiff indicated that he had been homeless on and off since the age of 23. *Id.* at 716. Plaintiff was diagnosed with alcohol and cannabis dependency, and he was referred for services relating to those diagnoses, and he was referred for a mental health assessment. *Id.* at 722.

On April 29, 2013, Plaintiff underwent a psychological evaluation with Psychologist Halas, M.A, at the request of the agency. Tr. at 667. Plaintiff indicated that he was living in the Samaritan House and dropped out of school in the 9th grade. *Id.* He stated that he was in special education classes and was expelled from school due to behavior problems. *Id.* Plaintiff admitted to legal problems, including being incarcerated for selling marijuana, and he had been convicted of assault and had been arrested for domestic violence, resisting arrest, disturbing the peace and disorderly conduct. *Id.* at 667-668. He was currently on probation and had one more month on supervision. *Id.* at 668.

Plaintiff described his physical health as being good except for his right arm deformity. Tr. at 668. He said he was hospitalized for three days to a psychiatric unit because he

-15-

overdosed on Xanax.  *Id*.  He also admitted to substance abuse issues, being placed in anger management, being diagnosed with bipolar disorder, and intermittent explosive disorder.  *Id*.

Plaintiff was observed as cooperative, hesitant, restless and sullen, seeming angry at times and irritated by the questions.  Tr. at 668.  His speech was slow and constricted and he seemed put out by the questions and by the appointment.  *Id*. at 669.  Dr. Halas had responses that were short, specific and goal-oriented, and his coherency and relevancy of his answers were poor and below average.  *Id.* Plaintiff's eye contact was poor and he reported a poor appetite and problems sleeping.  *Id*.  He reported crying spells, getting up at night, and he had a flat affect and depressed mood.  *Id*.  He admitted having a bad temper, being easily irritated, and acting out impulsively.  *Id.*  Plaintiff admitted to feeling hopelessness, helplessness and feelings of worthlessness.  *Id*.  Dr. Halas observed low levels of anxiety and no symptoms of thought disorder, hallucinations or delusions.  *Id.* He also observed that Plaintiff was oriented, had a good short-term memory, and his estimated intellectual levels were in the borderline range.  *Id.*  His level of insight and judgment were assessed as poor and below average.  *Id*. at 670.  Plaintiff described his daily living activities as waking up at 7:00 a.m. and spending time with his children and his girlfriend.  *Id*.  He reported that his son's mother does all of the cooking, cleaning, shopping, and laundry.  *Id*.  He indicated that he drove, but he did not have a license, and he did not play video games, have a cell phone, and did not get on a computer. *Id*.

On the basis of the interview, review of Plaintiff's 2001 psychological assessment completed in his office, and Plaintiff's medical records, Dr. Halas diagnosed Plaintiff with: polysubstance abuse, currently in remission; depressive disorder, not otherwise specified; borderline personality disorder with antisocial features; and borderline intellectual functioning. Tr. at 670.  *Id*.  He assigned Plaintiff a global assessment of functioning score of 45, indicative of serious symptoms, and he remarked that Plaintiff has "significant" psychological issues.  *Id*. In discussing his four work-related mental abilities, Dr. Halas opined that Plaintiff had significant problems in understanding, remembering and carrying out instructions due to his borderline intellectual functioning, his prior placement in special education classes, and his

-16-

limited work history  *Id*. at 671.  As to Plaintiff's abilities to maintain attention and concentration and to maintain his persistence and pace to perform simple tasks and multi-step tasks, Dr. Halas opined that Plaintiff would have some problem due to his mental status testing. *Id*.  In responding appropriately to supervision and coworkers in a work setting, Dr. Halas opined that Plaintiff would have significant difficulties due to his depression and personality issues.  *Id*.  In describing Plaintiff's abilities and limitations to responding appropriately to work pressures in a work setting, Dr. Halas opined that Plaintiff would have little or no difficulty in this area as he did not appear to be tense, anxious or apprehensive and he appeared to have no issues regarding panic/anxiety attacks or phobias.  *Id*.

On August 21, 2013, Plaintiff self-referred for a diagnostic assessment for his mood swings, anger, sadness, and problems with his ex-girlfriends not letting him visit his children. Tr. at 701.  He reported that he had increased stress, depression, and pain in his right hand and arm.  *Id*.  Plaintiff also reported that he was unhappy with his life and felt like he did not know where to turn for help.  *Id.*  Nurse and Licensed Social Worker Colucci, who interviewed Plaintiff, indicated that Plaintiff met the criteria for bipolar disorder, intermittent explosive disorder, and cannabis dependence.  *Id.*

On August 29, 2013, Plaintiff had his first counseling session for help dealing with his stress, anxiety, worry, and depression.  Tr. at 699.  He reported that he had felt depressed for the last two years and he indicated that part of the problem was the lack of visitation that he had with his two children from two different mothers, even though he did not file for court orders for visitation rights.  *Id*.  He explained that he did not seek court intervention because of his lack of stable housing and his use of marijuana.  *Id.*  He reported that he could stop using marijuana whenever he wanted to, but it helped him cope with stress. *Id.*  He also indicated that he had anger problems and his highest grade attended in school was 7th grade, but his biggest concerns were his anxiety and worrying.  *Id.*  Biweekly counseling was recommended. *Id*.

### III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.  **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v.*

-18-

*Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## V.       LAW AND ANALYSIS

Plaintiff's only assertion is that the ALJ erred when he barred Plaintiff's counsel from submitting a written interrogatory to the ALJ after the hearing and cut counsel off at the ALJ hearing and barred her from fully cross-examining the VE.  ECF Dkt. #14 at 11-13.  Plaintiff contends that the ALJ lacked substantial evidence to support his reasons for denying Plaintiff's counsel's post-hearing request to submit an interrogatory to the VE about the ALJ's hypothetical individual to the VE who had numerous limitations, and specifically, the limitation to superficial interaction, which the ALJ defined as meaning job duties that do not require arbitration, negotiation, or conflict resolution, supervision or management of others, or being responsible for the health, safety, or welfare of others.  ECF Dkt. #14 at 11, citing Tr. at 599.  Plaintiff asserts that the ALJ erred by cutting off his counsel's questioning of the VE at the hearing and by denying the post-hearing request to submit the interrogatory. *Id.*

Plaintiff points out that the Sixth Circuit Court of Appeals has acknowledged that due process principles apply to Social Security proceedings.  ECF Dkt. #14 at 11, citing *Robinson v. Barnhart,* 124 Fed. App'x 405, 410 (6th Cir. 2005).  The Unites States Supreme Court has held that the "fundamental requirement of due process is the opportunity to be heard 'at a

meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The Sixth Circuit Court of Appeals has held that disability claimants are entitled to due process at the hearing level because they have a property interest in any potential benefit. *Flatford v. Chater*, 93 F.3d 1296, 1304 (6th Cir. 1996). Thus, the Sixth Circuit has also held that an ALJ must ensure that the hearing is "full and fair." *Id.* at 1306.  "A claimant must have the opportunity to present all of his evidence and to confront the evidence against him." *Id.*  However, an absolute right of cross-examination is not required in every social security case in order to have a full development of the record.  *Id.* at 1307.  "[D]ue process requires that a social security claimant have the opportunity to cross-examine...where reasonably necessary to a full development of the evidence." *Id.*  Interrogatories may often "provide a meaningful opportunity for a disability claimant to confront the evidence he believes to be adverse to his claim." *Id.* at 1306.  However, "[a]n ALJ has discretion to determine whether additional evidence is necessary." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010).

Plaintiff cites and quotes HALLEX I1-2-5-57A which notes the preference that ALJs obtain VE testimony at a live hearing, but acknowledges that "[a]n ALJ can use written interrogatories at any point in the adjudication process" in order to resolve conflicts in the record relating to vocational issues.  ECF Dkt. #14 at 12; HALLEX I-2-5-57A and B. HALLEX I-2-5-57A further provides that a claimant or his representative may ask the ALJ to obtain interrogatories.  *Id.*  If an ALJ denies the use of interrogatories by a claimant, which may deny a plaintiff the right to confront the evidence against him, substantial evidence may be found to be lacking for the ALJ's decision.  *Harriman v. Comm'r of Soc. Sec.*, No. 2:16-cv-514, 2017 WL 2821704, at *3 (S.D. Ohio June 30, 2017), citing *Rahe v. Astrue*, 840 F. Supp. 2d 1119, 1138 (N.D. Iowa 2011); *see also Quattlebaum v. Comm'r of Soc. Sec.*, 850 F. Supp. 2d 763, 781 (S.D. Ohio 2011) (ALJ's failure to follow-up with interrogatories left Court without a basis for meaningful judicial review).

The undersigned recommends that the Court find that the ALJ did not prevent Plaintiff's counsel from fully questioning the VE or from continuing her questioning of the

-20-

VE. The ALJ was clearly frustrated that Plaintiff did not appear at the recent hearing and at a number of previously scheduled ALJ hearings and consultative examinations.  Tr. at 96-98. However, Plaintiff's counsel noted on the record her attempts to contact Plaintiff and that her office received returned mail with a bad address stamp.  *Id*. at 97.  In addition, Plaintiff responded to the ALJ's show cause notice on November 2, 2017 and explained that he had not resided at the address to which notices were mailed for the past year and he had not received the notices of consultative examinations or notices of hearings.  *Id*. at 30.  He indicated that he was homeless and lack monies for a phone.  *Id.*

Despite the ALJ's frustration, he proceeded with the most recent hearing and took the testimony of the ME and the VE and allowed Plaintiff's counsel to question both experts.  Tr. at 105-141.  As indicated above, the ALJ held his latest hearing on October 12, 2017, with only the ALJ, Plaintiff's counsel, the ME, and the VE in attendance.  Tr. at 94. The ALJ noted Plaintiff's absence and Plaintiff's prior absences at hearings and at consultative examinations. *Id*. at 96.  The ALJ questioned the ME and then allowed Plaintiff's counsel to question the ME. *Id*. at 106-121.  The ALJ then proceeded to question the VE and asked him to assume a hypothetical individual with the claimant's same age, education and work background with no past relevant work, and with:  the abilities to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently when using both upper extremities, but only up to 10 pounds occasionally and less than that frequently when lifting and carrying with the non-dominant right arm; sitting, standing and walking for up to 6 hours per day of an 8-hour workday; no climbing of ladders, ropes or scaffolds; occasional crawling; avoiding all exposure to hazards such as machinery and unprotected heights; no commercial driving; dominant upper extremity can constantly handle, finger, feel and reach, but non-dominant right upper extremity is limited to less than occasional handling, fingering, or feeling, and no limitation on reaching with non-dominant upper extremity;  understanding and remembering simple one to three-step instructions commensurate with a SVP of 1 or 2 skill level; ability to concentrate and persist on simple one to three-step tasks commensurate with 1 and 2 SVP skill level in a work setting that does not have a fast pace; superficial interaction with others, in that his job duties cannot

involve arbitration, negotiation, or conflict resolution, supervision or management of others or being responsible for the health, safety or welfare of others; and capable of adapting to infrequent changes in a static, non-public work setting. *Id*. at 125-128.

The VE responded by first stating that most of the literature and studies relating to dexterity, handling and fingering deal with bilateral dexterity in most jobs because the hands need to work together. Tr. at 128. He indicated that in his experience, someone with the limitations that the ALJ set forth in the hypothetical individual would probably need special accommodation due to the very low bimanual dexterity for manipulation. *Id*. at 129. He identified the jobs of surveillance system monitor, restaurant host, and school bus monitor, but noted that the number of these jobs would be very limited because sedentary jobs are for the most part high-dexterity positions, and the non-public setting and superficial interaction limitations would also cause problems. *Id*. He opined that the hypothetical individual could not be employed without a specialized placement or accommodation. *Id.* The ALJ identified additional jobs, but the VE indicated that those jobs could not be performed without some use of non-dominant hand and bimanual dexterity. *Id.*

The ALJ inquired further into the surveillance system monitor job, and the VE explained that it would meet the ALJ's hypothetical individual, although the person would need to use a computer for computer entry using one hand, so in some settings, the job could not be performed, and thus there would be very reduced numbers of these jobs available. Tr. at 130. He estimated that about 15,000 such jobs would be available out of 100,000 existing in the national economy. *Id.*

Plaintiff's counsel then questioned the VE. Tr. at 131. She questioned the VE's testimony concerning the skill set required with the surveillance system monitor position, explaining that in her experience with this position, it has been discredited because most of the jobs are done by the government with transportation agencies and after 9/11, a higher skill-set is required. *Id*. The VE responded that he agreed that this job is more classified in transportation systems, but his experience and observation is that there are some positions available in retail settings and office complexes that have monitoring through videos and that

do not require the higher skill-set and in fact are unskilled positions. *Id.* at 131-132.  Plaintiff's counsel also questioned the VE's number of 15,000 such jobs available and he responded that it was his estimation based upon his experience. *Id*. at 135.

When the ALJ asked to clarify whether the 15,000 jobs needed a special accommodation, the VE answered that he did not believe so, but he thought generally that it would be best to have someone help with a specialized placement.  Tr. at 136.  He indicated that, "I think the person could do the job, whether they would be placed or not I guess is something I don't consider." *Id*.  When Plaintiff's counsel asked if the VE was suggesting that the hypothetical individual needed a job coach for placement for the job, the ALJ interrupted her and said, "I don't believe that's [sic] at all."  The VE then responded that a job coach was not needed, but he was thinking of "somebody like a rehab counselor or somebody that could work with employers and place somebody based on" to which the ALJ interrupted and indicated that he was strictly looking at whether the hypothetical individual could perform the job duties of surveillance system monitor and if those jobs existed in the numbers that the VE gave. *Id*.  The VE indicated that they did. *Id*.

Plaintiff's counsel then asked the VE about the reasoning level of 3 indicated for the surveillance system monitor job under Dictionary of Occupational Titles ("DOT") 379.367-010.  Tr. at 137.  The ALJ asked counsel where she found the reasoning level, and counsel identified DOT 379.367-010. *Id*.  The ALJ stated that this was not put into the record and counsel indicated that this is what the VE was testifying to. *Id.*  The ALJ indicated that he understood this, but he was asking what counsel was looking at and did not know the source to determine whether it was a genuine reproduction or if it was accurate, or if it was the same thing that the VE was using. *Id*. at 137-138.  The VE responded that "it's listed as the middle third of the population, so pretty much in the middle, around the mean." *Id*. at 138.  Plaintiff's counsel then read the requirements for the position as having to "[a]pply common sense understanding to carry out instructions furnished in written, oral or diagrammatic form; deal with problems involving several concrete variables and/or from standardized situations." *Id.* Plaintiff's counsel reminded the VE that the ALJ's hypothetical individual "was limited to

simple. It was limited to not many variables, one to three-step instructions—" to which the ALJ interrupted and stated that he did not believe that he ever used the word "simple." *Id.* Plaintiff's counsel told the ALJ that she was looking at his prior decision and saw the word "simple" used, and the ALJ indicated that he was not looking at his former decision.  The ALJ then told Plaintiff's counsel that they were looking at what was before them now and that they were well over the time scheduled for the instant hearing.  *Id.*  He told her that if she had a few questions left for the VE, she could ask them, but his former decision was irrelevant.  *Id.* Plaintiff's counsel then shifted to the state agency's opinion, and the ALJ indicated that he was not asking the VE to testify as to the state agency opinion, but was asking him to testify based upon the information given to him by the ALJ and the ALJ's job was to interpret what the record supported.  *Id.* at 139.

Plaintiff's counsel then asked the ALJ if he was saying that he did not use the word "simple" in his RFC for Plaintiff, and the ALJ stated that he did not believe that he used that word in the RFC.  Tr. at 139.  He then asked, "[s]o, do you have further questions for our vocational expert or are we done?" *Id.*  Plaintiff's counsel responded:

| | |
|---|---|
| Plaintiff's counsel: | Okay.  You're pressing me to finish.  Your Honor, and I think the word - - if the word simple is not in your RFC, I think you have to reconsider it because the state agency certainly uses the word simple and your - - and the consultative exam - - |
| ALJ: | I have a number or[sic] reasons whey I'm not going to consider that in this particular hypothetical.  I've used the - - |
| Plaintiff's counsel: | Why? |
| ALJ: | - - what I feel is a supported RFC from the record.  Now, I may have some questions regarding absenteeism or being off task or some other issues that I need to address briefly, but - - |
| Plaintiff's counsel: | Okay. |
| ALJ: | - - it is what it is right now.  I have a complete lack of - - I'm not even sure quite frankly that any of these mental limitations are warranted.  For example, I've sent him to consultative examinations to try to confirm some of this and he chose not to go. |

| | |
|---|---|
| Plaintiff's counsel: | Okay.  But historically, and I'm not trying to be argumentative, if they - - |
| ALJ: | You can save that argument for the Appeals Council.  We're done, okay? |
| Plaintiff's counsel: | Okay. |
| ALJ: | If you have some other questions, please move on. |
| Plaintiff's counsel: | Okay.  All right. |
| ALJ: | You've taken - - I've been more than generous with the time we've had for this hearing.  We start at 8:30, it's quarter after 10:00. |
| Plaintiff's counsel: | Okay. |
| ALJ: | If you do have a few more questions you're welcome to ask but we've gone over whether or not he feels that this answer to the hypothetical was supported based on his opinion.  He said it was, okay? |
| Plaintiff's counsel: | Right. |
| ALJ: | Now we're starting to get repetitive.  I'm not going to say badgering but I think it's time to move on. |
| Plaintiff's counsel: | Okay, thank you.  No more questions. |

*Id.* at 139-141.  The ALJ then asked the VE whether additional jobs besides the surveillance system monitor job would be available for the hypothetical individual if all of the mental limitations were removed, but the SVP 1 or SVP 2 skill levels remained, and the VE responded that there would be no additional jobs.  *Id.* at 141.  The ALJ then proceeded to ask the VE about absenteeism and being off-task and he then asked Plaintiff's counsel if she wished to follow up with the VE about his questions.  *Id.*  Plaintiff's counsel responded that she did not, and the ALJ ended the hearing.  *Id.* at 141-142.

In his decision, the ALJ outlined the procedural history of Plaintiff's case, including Plaintiff's failures to attend consultative examinations and ALJ hearings.  Tr. at 10.  The ALJ further addressed the request of Plaintiff's counsel to submit an interrogatory to the VE after the hearing:

> Oddly, it was not until the conclusion of the hearing [The October 12, 2017 hearing] that Ms Balin informed the undersigned that she had the phone number of an old girlfriend of the claimant, and maybe she could track the claimant

> through the old girlfriend.  Nothing in the record adequately explains shy[sic] such efforts were undertaken sooner.  Due to this lack of diligence, and for additional reasons, the undersigned denies all post hearing requests, including that at Exhibit 20E.

*Id.* at 10.  Exhibit 20E is a letter from Plaintiff's counsel to the ALJ dated November 24, 2017 requesting that Plaintiff be granted the ability to submit a single interrogatory to the VE.  *Id.* at 599. Plaintiff's counsel explained that the interrogatory may be case-determinative because the ALJ presented a hypothetical individual to the VE who could interact superficially with others, and the ALJ defined superficially as job duties not requiring arbitration, negotiation, or conflict resolution, supervision or management of others or to be responsible for the health, safety, or welfare of others.  *Id*. Plaintiff's counsel indicated that superficial addresses the depth of the interaction with others, and the VE was not asked any questions about the frequency of the interaction with others.  *Id.*  Plaintiff's counsel cited to Dr. Halas' examination report in which he opined that Plaintiff would have significant difficulties in responding to supervisors and co-workers due to his depression and personality issues*. Id.*

The undersigned recommends that the Court find no merit to Plaintiff's claims. The ALJ did not cut off Plaintiff's counsel during the hearing or deny her the ability to continue to question the VE.  A review of the transcript shows that Plaintiff's counsel began asking the VE questions about the superficial interaction prong of the ALJ's hypothetical individual and the surveillance system monitor job, but she then decided to veer in another direction of her questioning on her own accord instead of pursuing the superficial interaction questioning.  *See* Tr. at 136-137.  Further, when Plaintiff's counsel started off asking the VE whether the reasoning level for the surveillance system monitor job complied with the ALJ's hypothetical individual limitation to "simple one to three step instructions" and then veered off into whether the ALJ's prior decision contained the word "simple" and whether it corresponded with the agency's opinion, the ALJ properly refocused the questioning by asking if counsel had any further questions of the VE, since counsel's discussion of the "simple" limitation became a discussion of whether the ALJ used the word rather than whether the surveillance system monitor job requirement was so limited.  And the ALJ specifically asked Plaintiff's counsel

three times if she had more questions for the VE and whether she wished to proceed with her questions for the VE.  Tr. at 139-140.  For these reasons, the undersigned recommends that the Court find that the ALJ did not deny Plaintiff his due process rights by cutting off his counsel's questioning of the VE at the hearing.

Further, the undersigned agrees that the ALJ's written reasons for denying Plaintiff's request to submit a post-hearing interrogatory are lacking.  However, Plaintiff's  counsel had a full and fair opportunity to question the VE at the hearing about the superficial interaction limitation and actually began questioning the VE on this subject, but then took her line of questioning in another direction concerning the reasoning level of the surveillance system monitor job.  Tr. at 136-137.   Accordingly, the ALJ did not deny Plaintiff his right to due process by denying his counsel's request to submit an interrogatory to the VE after the hearing when counsel had a full and fair opportunity to question the VE about the issue and began doing so at the hearing.

## VI.     CONCLUSION AND RECOMMENDATION

The undersigned is troubled by this case, particularly in light of Plaintiff's right hand limitations and indications that he did not receive notice of the consultative examinations or of the prior ALJ hearings.  However, the undersigned recommends that the Court find that the ALJ did not deny due process rights or commit error by denying Plaintiff's request to submit a post-hearing written interrogatory to the VE or bar Plaintiff's counsel from fully questioning the VE at the hearing.  Accordingly, the undersigned recommends that the Court AFFIRM the decision of the ALJ and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.


Date: July 10, 2019                          ___/s/George J. Limbert_____
                                             GEORGE J. LIMBERT
                                             UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


-27-